**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

ALLISON DOCKHORN,         )
         )
        **Plaintiff,**         )
         )
         )
**vs.**         )     **Case No. 08-2307-JAR**
         )
**KITCHENS BY KLEWENO,**         )
**et al.,**         )
         )
        **Defendants.**         )
_____)

## MEMORANDUM AND ORDER

In this subrogation action, plaintiff Allison Dockhorn alleges claims against defendants Kitchens by Kleweno ("Kleweno"), Cherie Brown, David Brown, d/b/a Designer Craftsman Renovation, and Clifford "Kent" Means, d/b/a Clifford Engineering Electric Company arising out of a fire that damaged plaintiff's home. Plaintiff asserts the following claims: 1) negligent design; 2) negligent failure to warn; 3) breach of express and implied warranty; and 4) breach of contract.[1] This matter presently comes before the Court on the following motions: Joint Motion for Summary Judgment (Doc. 149) filed by defendants Kleweno, Cherie Brown and David Brown (collectively the "defendants"); Motion for Summary Judgment (Doc. 154) filed by defendant Clifford "Kent" Means; defendants' Joint Motion in Limine to Exclude the Testimony of Plaintiff's Experts, James Martin (Doc. 151) and Michael Schlatman (Doc. 153); Motion to Exclude Plaintiff's Experts (Doc. 157) filed by defendant Means; and defendants' Motion to

---

[1]The products liability claim asserted against Häfele America Company was dismissed, because it was a distributor and not a manufacturer (Doc. 111.)

Strike Memorandum in Opposition to Motion for Summary Judgment (Doc. 187).  For the reasons set forth below, defendants' motions are granted in part and denied in part.

I.      **Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[2] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[6]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an

---

[2]Fed. R. Civ. P. 56(c)(2).

[3]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[6]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[7]*Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).

essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12] "The nonmoving party does not have to produce evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible."[13]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15] When examining the underlying facts of the

---

[8]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671); *see also Kannady v. City of Kiowa,* 590 F.3d 1161, 1169 (10th Cir. 2010).

[9]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[10]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[11]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197-98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671); *see Kannady,* 590 F.3d at 1169.

[12]*Adams,* 233 F.3d at 1246.

[13]*Id.*

[14]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[16]

## II.    Motion to Strike

Before determining the uncontroverted facts in this matter, the Court must address defendants' motion to strike.  The standards for ruling on a motion to strike are well established. Rule 12(f) of the Federal Rules of Civil Procedure provides that the court may order stricken from any pleading "any redundant, immaterial, impertinent or scandalous matter."[17]  Because striking an entire pleading, or a portion thereof, is a drastic remedy, and because a motion to strike may often be brought as a dilatory tactic, motions to strike under Rule 12(f) are generally disfavored.[18]  The decision to grant a motion to strike lies within the court's sound discretion.[19] This Court typically declines to strike a response to a motion for summary judgment or a supporting affidavit that does not comply with D. Kan. Rule 56.1 or Rule 56(e), and instead simply disregards those portions of the response or affidavit that do not comply.[20]  Defendants move to strike plaintiff's Statement of Additional Facts as well as plaintiff's second affidavit. The Court will discuss each in turn.

---

[16]*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[17]Fed. R. Civ. P. 12(f).

[18]*Thompson v. Jiffy Lube Int'l, Inc.*, No. 05-1203-WEB, 2005 WL 2219325, at *1 (D. Kan. Sept. 13, 2005); *Pencro Assoc., Inc. v. Sprint Corp.*, No. 04-2459-JWL, 2005 WL 950626, at *1 (D. Kan. Apr. 25, 2005);

[19]*Geer v. Cox*, 242 F. Supp. 2d 1009, 1025 (D. Kan. 2003).

[20]*See, e.g., Stevens v. Water Dist. One of Johnson County*, 561 F. Supp. 2d 1224, 1231 (D. Kan. 2008) (citation omitted).

## A.     Statement of Additional Facts

Defendants move to strike plaintiff's entire Statement of Additional Uncontroverted Facts numbered 1 through 145 on the basis it violates Rule 56.1 because it contains assertions that are not material or concise, are based on plaintiff's "sham affidavit," are argument, speculation or conclusory, or are otherwise inadmissible.  Defendants complain that in their motion for summary judgment, they submitted a mere fourteen facts, compared to the 145 additional facts set forth by plaintiff.  Defendants respond to all but nine of plaintiff's numbered Statement of Additional Uncontroverted Facts with the following identical paragraph:

> Defendants object to this "uncontroverted fact" asserted by Plaintiff on the basis it violates Federal District Court Rule 56.1(b) in that it: (1) is in no way material to the Motion for Summary Judgment; (2) is not concise; (3) is based on Plaintiff's sham Affidavit; (4) is not a fact; and/or (5) is otherwise inadmissible evidence.  Plaintiff misuses the Rules of Civil Procedure by asserting immaterial facts in order to attempt to create the appearance of a disputed issue/matter where none exists, attempting to use the asserted "fact" as a request for admissions after discovery has closed, and to give a narrative to Plaintiff's trial themes.  Accordingly, Defendants have contemporaneously filed a Motion to Strike this "fact" and incorporate it herein.  Defendants may respond to this "fact" pending the Court's ruling on Defendant's [sic] Motion to Strike and will respond based on such ruling.[21]

Rule 56.1(b), the local rule for summary judgment responses, requires:

> (1) . . . [A] section that contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the

---

[21]Instead of setting forth their standard objection and referencing the specific numbered statements of additional fact, defendants actually cut and pasted the same paragraph 136 times, resulting in 65 additional pages to their reply brief. (Doc. 186).  The Court finds this tactic neither productive nor amusing.

opposing party relies, and, if applicable, shall state the number of movant's fact that is disputed.

(2) if the party opposing summary judgment relies on any facts not contained in the movant's memorandum, that party shall set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by subsection (a), above. **All material facts set forth in this statement of the non-moving party shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the reply of the moving party.**[22]

The response must "fairly meet the substance of the matter asserted."[23]  In turn, in a reply brief, "the moving party shall respond to the non-moving party's statement of undisputed additional material facts in the manner prescribed in subsection (b)(1)."[24]

While defendants object to plaintiff's statement of additional facts, it is defendants who are not in compliance with the Rule 56.1.  Significantly, in addition to failing to respond to plaintiff's additional facts, defendants do not even explain which of the five objectionable categories each additional fact falls within.  While plaintiff's additional facts are quite numerous, and some appear to be hyperbole, the Court disagrees with defendants' blanket characterization of all but nine of plaintiff's additional facts as immaterial or improper.  Remarkably, plaintiff sets forth additional facts regarding terms of the parties' contract, defendants' services and training as kitchen designers and contractors, as well as details and circumstances of the fire, none of which were addressed in defendants' fourteen statement of facts and which the Court considers material to the issues before it.  Accordingly, the Court declines to strike plaintiff's

---

[22]D. Kan. R. 56.1(b) (emphasis added).

[23]R. 56.1(e).

[24]R. 56.1(c).

Statement of Additional Uncontroverted Facts, and will instead disregard any additional facts that are immaterial or otherwise do not comply with the relevant rules.

The Court further declines to afford defendants the opportunity to controvert plaintiff's additional facts. Defendants have effectively abdicated their obligations under Rule 56.1 to the Court and will not be afforded "do-overs." Defendants' failure to strictly comply with the local rules, coupled with the tone of the parties' briefs, has made this Court's task much more difficult and has consumed more of the Court's time and energy than should be necessary in ruling on a motion for summary judgment. Accordingly, plaintiff's additional facts are deemed admitted for purposes of summary judgment, to the extent they are supported by the record and material to the Court's disposition of the motion.

### B.    Plaintiff's Second Affidavit

Defendants ask the Court to strike and disregard portions of plaintiff's second Affidavit at paragraphs 1, 4, 5,6, 7 and 8, arguing that the affidavit constitutes a "sham" affidavit or alternatively, is conclusory, inadmissible and self-serving.

"[A]n affidavit may not be disregarded [solely] because it conflicts with the affiant's prior sworn statements. In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue."[25]  In determining whether an affidavit creates a sham issue, the Tenth Circuit has directed district courts to consider whether "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony

---

[25]*The Law Co., Inc. v. Mowhawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain."[26]  The Circuit "explicitly require[s] that a district court first 'determine whether the conflicting affidavit is simply an attempt to create a "sham fact issue" before excluding it from summary judgment consideration.'"[27]  In addition, Fed. R. Civ. P. 56(e)(1) provides that "[a] supporting or opposing affidavit must be admissible in evidence, and show that the affiant is competent to testify to the matters stated." "Though an affidavit which fails to meet any of the three requirements is subject to a motion to strike, the [c]ourt may also enforce the rule by disregarding portions of the affidavit it finds insufficient."[28]  "Conclusory and self-serving affidavits are not sufficient."[29]

Plaintiff provided her first affidavit on August 28, 2008.[30]  Plaintiff was deposed on March 5, 2009.[31]  Her second affidavit was provided on November 2, 2009.[32]  Plaintiff's deposition testimony provides, in part:

> Q.    It's common knowledge that if you put something too close
>        to a light, it's going to cause fire?
> A.    Yes.

---

[26]*Id.* (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001)).

[27]*Id.* (quoting *Durtsche v. Am. Colloid Co.*, 958 F.2d 1007, 1010 n.2 (10th Cir. 1992) (quoting *Franks*, 796 F.2d at 1237)).

[28]*City of Shawnee, Kan. v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1177 (D. Kan. 2008) (internal quotation and citations omitted).

[29]*Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)).

[30](Doc. 178, Ex. 10.)

[31](Doc. 187, Ex. 12.)

[32](Doc. 178, Ex. 11.)

. . .

Q.     You didn't need a warning to tell you that, did you?  That's
       something you knew as common knowledge?

A.     Yes.

. . .

Q.     You understood clothing is flammable?

A.     Correct.

Q.     Can be?

A.     Uh-huh.

Q.     Sheets can be flammable, true?

A.     Yes.

Q.     Papers flammable?

A.     Yes.

Q.     These are things you knew about?

A.     Yes.

Q.     Common sense?

A.     Correct.

. . .

Q.     Regardless of whether or not you were warned, you knew
       that halogen lights got hot?

A.     Correct.

Q.     You knew as a matter of common sense that if things were
       placed too close to the halogen lights, they could catch
       fire?

       (Objection to form by plaintiff's counsel.)

Q.     True?

A.     Yes.[33]

Defendants object to the following paragraphs in plaintiff's second affidavit:

1.     While I was aware that light bulbs get hot, prior to the date of the fire I did
       not have any specific knowledge that the halogen under-cabinet puck

---

[33](Doc. 188, Ex. A.)

lights installed in my kitchen and laundry room would become so hot that they were capable of setting fire to normal household items placed on the countertop.

. . .

4.      Prior to the fire occurring at my home, I did not know that the halogen under-cabinet puck lights installed during my kitchen and laundry room remodel could set fire to clothing or other ordinary household items placed on the countertop.

5.      Even though I knew that all light bulbs get hot, I had no reason to know that clothes and bed sheets sitting on the countertop below the halogen lights, but not in direct contact with the lights, would be a fire hazard.

6.      I was not informed or warned by anyone prior to the fire that the puck lights could produce the amount of heat necessary to cause a fire hazard.

7.      I was not informed or warned by Kent Means, David Brown, Cherie Brown or Randy Sisk that I should not put any flammable materials within 12 inches directly below the puck lights.

8.      Restricting the use of the countertops to six inches of safe usable space would have rendered the countertops in the kitchen and laundry areas useless.

Defendants argue that paragraphs 1, 4 and 5 should be stricken because they are inconsistent with plaintiff's deposition testimony, and are offered to create a fact issue where none exists.  Plaintiff responds that the line of questioning in plaintiff's deposition was too general, vague and ambiguous to apply to the specific situation at hand.  Although counsel objected to the form of the question, he did not cross-examine plaintiff further on this issue.

The Court agrees with plaintiff that the deposition testimony and these three paragraphs are not necessarily inconsistent on this point.  It is apparent to the Court that defendants' questions to plaintiff on her knowledge of halogen lights and flammable items were cast in very

general terms, which this declaration attempts to explain more specifically in the context of the lights and countertop items in her kitchen and laundry room. Additionally, it is undisputed that plaintiff was not cross-examined. For these reasons, the Court declines to disregard plaintiff's declarations about her specific knowledge of a potential fire hazard in her kitchen.

Defendants also argue that paragraphs 6 and 7 are inconsistent with her deposition testimony as well as paragraph 10 of her second affidavit, which states:

> I do not know if these instructions were actually left in the stack of documents left for me by David Brown following the completion of the project. Even if this document had been included, I would not have had any reason to review it, as I relied upon those that were doing the work in my house to properly install the cabinets, lighting, appliances and fixtures.

David Brown testified in his deposition that he delivered paperwork regarding appliances and fixtures to plaintiff, including the mounting instruction sheet that came with the light fixture, which included a written warning. Although plaintiff did not recall at the time of her deposition specifically the warning being left in the paperwork, she admitted, "It could have been." Defendants argue that plaintiff cannot testify now that she was not "warned by anyone" prior to the fire that the puck lights could produce the amount of heat necessary to cause a fire hazard.

Paragraph 6, 7 and 10 should be read in conjunction with paragraph 9, which states, "Before this litigation, I never saw or reviewed the Mounting Instructions for the puck lights, which were installed in my kitchen and laundry room." Moreover, paragraph 8 of plaintiff's first affidavit states, "I was not warned by Kleweno, DCR or its contractors that the lighting fixtures and component parts of the Lighting System generated substantial and excessive heat. I did not

know that the Lighting System was a fire hazard."[34] The Court agrees with plaintiff that the deposition testimony and these three paragraphs are not necessarily inconsistent on this point. Plaintiff has consistently testified that she was not verbally informed or warned of the potential hazards caused by the halogen lights and that she did not know if the warnings were included in the paperwork left by David Brown; this declaration attempts to explain that even if had left the "Mounting Instructions," she never saw them and does not know if Brown actually left these instructions. The issue of whether plaintiff received adequate warnings about the light fixture has always been in dispute, and plaintiff's declarations do not create a sham fact issue where none existed before. Additionally, it is undisputed that plaintiff was not cross-examined. For all of these reasons, the Court declines to disregard plaintiff's declarations in paragraphs 6 and 7.

Finally, defendants object to paragraph 8 on the grounds that it is conclusory and self-serving and is based on mere speculation, conjecture and/or surmise. In addition, defendants argue this testimony is purely opinion, and thus inadmissible on summary judgment. Plaintiff does not dispute that this declaration is inadmissible, but should be considered on summary judgment on the chance that it may ultimately be presented at trial in an admissible form. The Court agrees with defendants, and disregards this declaration, as plaintiff is not competent to testify on the matters stated, as required by Rule 56(e)(1).

## III.     Statement of Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or taken in the light most

---

[34](Doc. 178, Ex.10.)

favorable to plaintiff.

Defendant Kleweno is a company specializing in kitchen planning and interior design. Randall Sisk, President and owner of Kleweno, testified in his deposition that Kleweno designs the layout of clients' spaces. When the final stage of the drawing is prepared, it is a working blueprint, which serves as a script to be implemented into the project. The plan is drawn for the client, but belongs to Kleweno until a contract is signed. Sisk testified that he has never taken any courses or additional education or training in the area of kitchen design, other than on-the-job training from his former partner, Merle Kleweno. Sisk is not certified or licensed in his field, nor is he an architect.

Plaintiff entered into a contract on October 17, 2001 with defendant Kleweno to design and build a custom kitchen and laundry room for her home, including the sale and installation of cabinetry, countertops, mantel, backsplash, appliances, lights over island, wood legs, cabinet lighting and electrical. Defendants used cabinetry by Neff Cabinets that was designed specifically for use with halogen lights. Neither plaintiff nor her then-husband was presented with the specific brand or details of the puck lighting to be installed and left the details up to the designer. Delivery and installation of the kitchen and laundry cabinetry and lighting system occurred before October 22, 2002.

Defendant Cherie Brown is employed by Kleweno as a "Kitchen Designer." She was the principal designer that worked with plaintiff. Brown did not take any additional classes or receive any additional education other than on-the-job training to achieve the designation and title of "Kitchen Designer." She does not hold any professional licenses.

Defendant David Brown, d/b/a Designer Craftsman Renovation ("DCR"), is an

independent contractor who performs general contracting services for Kleweno. David Brown is classified as a "Residential Contractor" who serves in the role as a residential general contractor, managing the project in terms of the implementation of the design and layout set forth in the working blueprints. Kleweno hired David Brown to install the over-the-counter, under-cabinet lighting. Kleweno provided the component parts for the under-cabinet halogen lighting system.

David Brown hired defendant Clifford "Kent" Means, d/b/a Clifford Engineering Electric Company, to assist him in all phases of the electrical work on the project, including the installation of the under-cabinet lighting. Means does not have an engineering degree or certificate of any kind, other than on-the-job training from a friend who is a Master Electrician. Means described the work he performed on the project as removing the old existing wiring and installing new branch circuitry wiring, switching and lighting that was part of the custom kitchen package.

On November 11, 2006, a fire occurred at plaintiff's residence. Plaintiff's sister, Stephanie Malm, was staying with plaintiff's children while plaintiff was out for the evening. Plaintiff left some folded clothes and sheets in the laundry room, on the countertop adjacent to the dryer. Her sister turned the under-cabinet lights on in the laundry room before leaving to take the children to dinner; the source of the fire has been identified as ignition of that laundry, which was heated to ignition temperature by the under-cabinet halogen light fixture. According to the printed installation instructions provided by Häfele with the halogen puck lights, "a minimum distance of 12 inches between the light and any surface must be maintained."

There are four different lighting systems in plaintiff's kitchen: 1) recessed can lights in the ceiling; 2) cable lighting system suspended from the ceiling over the island; 3) low-voltage

strip lighting placed on the top of the upper cabinets; and 4) under-cabinet halogen puck lighting system.  The light fixtures installed in the point of origin of the fire were Häfele brand 20-watt/12-volt rated, low-voltage halogen puck lights.  Plaintiff's ex-husband recalls David Brown describing the low-voltage lighting as a new way of doing decorative lighting, similar to accent lighting that one might put around a pool outdoors.  The kitchen included wall cabinets with halogen lights installed in the bottom panel for illumination of the countertop below.

Cherie Brown ordered twenty of the chrome 20-watt puck lights for the under-cabinet lighting.  Each halogen puck light comes individually wrapped with Mounting Instructions in a plastic bag. The mounting requirements indicate, "use only with a Häfele UL/CSA listed 12-volt/Class 2 power supply."  David Brown and Means did not use the Häfele power supply system.  The Mounting Instructions state that they contain "IMPORTANT MOUNTING REQUIREMENTS."  Specifically, the instructions state that when mounted for use in under cabinet application, the fixture shall be spaced 12" from any surfaces below the fixture.  In addition the Mounting Instructions advise:

> INSTRUCTIONS PERTAINING TO RISK OF FIRE, ELECTRIC SHOCK OR INJURY TO PERSONS.  IMPORTANT SAFETY INSTRUCTIONS.
>
> WARNING—To reduce the risk of FIRE, ELECTRIC SHOCK, OR INJURY TO PERSONS . . . 6.  Keep materials that my [sic] burn away from fixture.  A minimum distance of 12" between the light and any surface must be maintained.

This is the only specific documentation that would have been provided to plaintiff as it related to the halogen under-cabinet lighting system.

The plan drawings created by Cherie Brown generally indicated the placement of various

lights, but did not specify the make, model, brand, wattage or voltage or exact placement of any lights to be selected or installed in the kitchen or laundry room areas. The plan drawings show a diagram of the laundry room area identified as the point of origin for the fire. The drawings provide for 46 centimeters, or 18.1 inches, of clearance between the granite countertop and the bottom of the over-counter cabinetry. Plaintiff had already purchased an under-cabinet washer and dryer, which were incorporated into the design and layout of the kitchen and laundry room. The plan drawings did not indicate the path of the electric circuitry to provide power to the various lighting systems in the kitchen and laundry room. David Brown and Means made those decisions at the time of installation. Neff Cabinetry has optional lighting systems, but the designer has the choice of which brand to use. Cherie Brown testified that she paid attention to the 12-inch spacing requirement, for the even effect it has lighting the countertop . The only conversation Cherie Brown can recall with plaintiff regarding lighting was about creating even light, both on the work surface from above and underneath, and the decorative lighting.

The back side of the halogen puck lights have a warning label that states: "CAUTION: RISK OF FIRE." This warning would not be visible once the light was mounted and the concealer panel put into place. The only paperwork that includes warnings, customary instructions or other details on the light is that which comes with the Mounting Instructions. Kleweno tells its customers how to replace the light bulbs. Stamped on the surface of the puck light is a designation of numbers and symbols indicating that the 12-volt/20-watt halogen puck light should maintain a distance of 6 inches between the surface of the light and flammable materials. There is also an adhesive sticker to be taped onto the concealer panel.

Cherie Brown agrees that it would be necessary to have work space where plaintiff would

be taking laundry out of the washer and dryer.  The work space that plaintiff had in the laundry room was between the countertop and the over-counter cabinetry.  David Brown testified that he understood the 12-inch minimum distance and agreed that, based on the cautionary instructions of the mounting specifications, there would be approximately six inches of usable safe space on the countertops in plaintiff's kitchen.  Brown testified that he never told plaintiff that she should not put any combustible materials higher than six inches on her granite countertop.  The granite countertop is the only flat workspace in the laundry room, located above the clothes dryer.

Following the construction, both Cherie and David Brown provided a final walk-through.  Plaintiff's ex-husband testified that he did not remember anyone providing any warnings about placing anything under the halogen lights.  David Brown testified that it was their "common practice on every kitchen to leave the client with every single piece of paper that comes with every appliance, every fixture that goes into the kitchen."  Brown testified that he left the stack of literature in a drawer in plaintiff's kitchen.  Although he could not recall saying anything to plaintiff, Brown testified that it is "standard operating procedure" to tell the clients that they have left the literature in a specific place.  Brown does not recall saying anything to plaintiff about a warning label stating "Caution: Risk of Fire," that was affixed to the halogen puck lights, but not visible after installation.  Plaintiff does not know if the product literature left by Brown included information specific to the halogen puck lights.  Brown did not recall having a conversation with plaintiff going over any of the cautionary information listed in the Mounting Instructions.

The puck lights were provided to David Brown directly by Kleweno as part of the project.  As a contractor, Brown consults the working blueprint to see where the puck lights

should be placed, then installed the lights according to the spacing specifications from Häfele. When Brown began using the puck lights in 1996 or 1997, he would place the peel-off warning decal on the concealer panel so that the homeowner would be able to look up underneath the cabinet and see the warning. Brown testified that at some point, Häfele stopped providing the peel-off label. Brown testified that in the past, there was also a warning sticker that should be placed on the light itself, toward the lens. Brown does not recall whether the sticker came with the lights installed in plaintiff's kitchen.

Plaintiff testified that while she was aware that light bulbs get hot, prior to the date of the fire she did not have any specific knowledge that the halogen under-cabinet puck lights installed in her kitchen and laundry room would become so hot that they were capable of setting fire to normal household items placed on the countertop. Plaintiff used the surface area on the granite countertop immediately above the built-in washer and dryer in the laundry room for work space, including sorting and folding laundry before it was put away. Dockhorn testified that she was not informed or warned by plaintiffs that the puck lights could produce the amount of heat necessary to cause a fire hazard, nor was she informed that she should not put any flammable materials within 12 inches directly below the puck lights. Before this litigation, plaintiff testified that she never saw nor reviewed the Mounting Instructions for the puck lights and does not know if these instructions were in the stack of literature left by David Brown. Plaintiff states that even if this document would have been included, she would not have had any reason to review it, as she relied upon defendants to properly install the light fixtures. Plaintiff states that she never had a conversation with any of the defendants about any special care, use, instructions or warnings related to the under-cabinet lighting. There were no cautionary labels provided with these lights

or placed on or near the lights that were visible to plaintiff.

## IV.    Motions to Exclude Expert Testimony

Because several of defendants' issues on summary judgment turn on admissibility of expert testimony, the Court will first address the motions to exclude.

### A.    *Daubert* Standard

The Court has broad discretion in deciding whether to admit expert testimony.[35]  Fed. R. Evid. 702 provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[36]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[37]  In order to determine whether an expert opinion is admissible, the court performs a two-step analysis.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his

---

[35]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation omitted).

[36]Fed. R. Evid. 702.

[37]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

discipline.'"[38]  Second, the district court must further inquire into whether the proposed

testimony is sufficiently "relevant to the task at hand."[39]  An expert opinion "must be based on

facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or

speculation . . . absolute certainty is not required."[40]  And it is not necessary to prove that the

expert is "indisputably correct," but only that the "method employed by the expert in reaching

the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule

702's reliability requirements."[41]

"To qualify as an expert, the witness must possess such 'knowledge, skill, experience,

training or education' in the particular field as to make it appear that his or her opinion would

rest on a substantial foundation and would tend to aid the trier of fact in its search for the

truth."[42]  *Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider

when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been

tested; (2) whether it has been subjected to peer review and publication; (3) the known or

potential rate of error; and (4) general acceptance in the scientific community.[43]  In *Kumho Tire*,

however, the Supreme Court emphasized that these four factors are not a "definitive checklist or

test" and that a court's gatekeeping inquiry into reliability must be "tied to the facts of a

---

[38]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[39]*Id.* (quoting *Daubert*, 509 U.S. at 597).

[40]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[41]*Id.*

[42]*Farmland Mut. Ins. Co. v. AGCO Corp.*, 531 F. Supp. 2d 1301, 1304 (D. Kan. 2008) (citing *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)).

[43]*Daubert*, 509 U.S. at 593–94.

particular case."[44]  In some cases, "the relevant reliability concerns may focus upon personal

knowledge or experience," rather than the *Daubert* factors and scientific foundation.[45]

It is within the discretion of the trial court to determine how to perform its gatekeeping

function under *Daubert*.[46]  The most common method for fulfilling this function is a *Daubert*

hearing, although such a process is not specifically mandated.[47]  In this case, the parties have not

requested a hearing on these motions.  The Court has carefully reviewed the exhibits filed with

the motions and believes this review is sufficient to render a decision upon them without

conducting an oral hearing.

### B.    Michael Schlatman

Defendants seek to limit at trial the expert opinion testimony of Michael Schlatman, a

certified fire investigator designated by plaintiff as an expert witness.  Schlatman's expert

opinions may be summarized as follows.

Schlatman is a fire investigator for Fire Consulting and Case Review International.  On

November 16, 2006, his firm received an assignment to conduct an origin and cause examination

at plaintiff's residence.  Two Special Investigators from Schlatman's firms conducted a

systematic fire scene examination at the structure.  It was determined that the fire had originated

within a laundry room on the first floor and that combustibles that had been on a countertop had

been ignited by the heat from an undercabinet halogen light fixture immediately above them.

---

[44]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotations omitted).

[45]*Id* (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)).

[46]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[47]*Id*.

During the course of the examination, Schlatman also conducted a systematic examination of the scene. Various electrical components were removed from the loss site and turned over to Martin Engineering for further examination by electrical engineer Jim Martin.

Based on his examination, Schlatman concluded that

> There is no doubt that the fire originated from the ignition of combustibles on the countertop of the laundry room. The combustibles, consisting of "clothing, a sheet and a blanket" were heated to their ignition temperature by the under cabinet halogen light fixture.

> The installation of that type of fixture in that application is inherently unsafe. Homeowners are unfamiliar with acceptable clearances of combustibles to halogen fixtures.

> Although warnings by the manufacturer exist, homeowners will not be aware of them unless notified by designers or contractors utilizing them in that application.

Defendants do not object to Schlatman's testimony regarding the cause and origin of the fire, but object to his testimony on kitchen and laundry room design as well as consumer warnings.

### *Qualifications*

Defendants do not challenge Schlatman's educational background or competence to express opinions generally on matters of fire cause and origin. The Court notes that Schlatman has been actively engaged in the field of fire investigation for thirty years. He has been certified as a fire investigator by the Missouri State Fire Marshal's Office and the International Association of Arson Investigators ("IAAI"). He is an authorized instructor for the IAAI and the

National Fire Academy, including courses on the National Fire Protection Association ("NFPA") 921 Guide for Fire and Explosion Investigations, and fire investigation in commercial kitchen systems. Although Schlatman has no professional experience as a kitchen designer, cabinet maker or electrician, the Court agrees with plaintiff that his area of expertise would include identifying fire hazards, including whether a light fixture and cabinet configuration would constitute a fire hazard. NFPA 921 defines "Failure Analysis" as "[a] logical, systematic examination of an item, component, assembly or structure and its place and function within a system, conducted in order to identify and analyze the probability, causes, and consequences of potential and real failures."[48] Schlatman is qualified in failure analysis and the warnings associated with the failures. Likewise, Schlatman is qualified to testify about warnings as a means of reducing the level of risk associated with a known fire hazard. Schlatman attests that he is a certified NFPA 921 instructor, and has both studied and taught topics such as warning purposes, the key elements of a proper warning and applicable warning standards.

### *Reliability*

Defendants argue that Schlatman's opinions regarding design and warnings are not sufficiently reliable under the standards set forth in *Daubert* and *Kumho Tire*. Specifically, defendants argue that Schlatman's testimony 1) is not based on sufficient facts or data, 2) is not the product of reliable principles and methodology, and 3) does not apply reliable principles and methods to the facts of the case.

With respect to the first point, defendants argue that Schlatman's opinions regarding

---

[48]NFPA 921, 2004 Ed., § 3.3.50.

design or warnings are based on his speculation and surmise. Defendants point to Schlatman's testimony that he does not know how close combustible material needs to be to a halogen bulb to ignite because he has not performed any testing to make that determination, and that he has never reviewed testing regarding the amount of heat that is generated by a 20-watt halogen light bulb. Defendants also argue that Schlatman appears to base his opinion regarding proper design of under-cabinet lighting on his "experience," when in fact, he has no experience in this area. Similarly, with respect to his opinion regarding warnings, defendants argue that Schlatman has never spoken with a homeowner who had under-cabinet halogen lighting, has never conducted a study as to the effectiveness of written or verbal warnings of any kind, and has no knowledge about the information provided to plaintiff. With respect to the second point, defendants argue that Schlatman's report and deposition testimony are devoid of any information regarding the application of any particular principles or methodology in reaching the conclusions contained in his report regarding design and warnings. Similarly, with respect to the third point, defendants argue that Schlatman has conducted no research whatsoever in reaching his opinions.

The Court does not view any of defendants' articulated deficiencies in testing and methodology sufficient to render Schlatman's opinion inadmissible with respect to the design and placement of the light fixture as hazardous. The Court has reviewed Schlatman's affidavit, report and deposition in which he explained, among other things, that in reaching the conclusion that the light fixture created an unreasonable fire hazard when used in this application and configuration, he relied on his extensive background in fire investigation, including his specific familiarity with halogen light bulbs as a potential fire hazard, and his knowledge of the ignition temperatures for household materials, such as cotton. He also considered the fact that the

manufacturer established a minimum safe distance of twelve inches between the surface of the light and flammable objects. Based on his experience in the field of fire investigation, coupled with the specific information he learned about the manufacturer's warnings, Schlatman concluded that any material within the safe clearance zone created a fire hazard. Because the light fixture was positioned in such a way that normal use would include the placement of combustible items within that safe clearance zone, Schlatman concluded it was hazardous. The Court agrees with plaintiff that tests to determine how close combustible material needs to be to a halogen bulb to ignite would have added little or no weight to Schlatman's opinions, so long as the clothing was located somewhere within the 12-inch safe clearance zone. Schlatman based his opinion on his experience and expertise, as well as his investigation. In this case, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundations.[49] Because Schlatman's "method" does not involve application of any controversial scientific process or theory, the *Daubert* factors are of less utility.[50] Schlatman's method is sufficiently reliable for purposes of Rule 702, and the Court denies defendants' motion with respect to this testimony.

The Court's conclusion is different with respect to Schlatman's opinion regarding warnings. In reaching this conclusion, Schlatman considered his acquired understanding of the average person's lack of awareness of certain types of fire hazards. Schlatman opines that, in his experience, most people fail to appreciate or understand the hazards associated with halogen lights due to their high operating temperature. The Court agrees with defendants that Schlatman

---

[49] *Kumho Tire*, 526 U.S. at 150 (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)).

[50] *Farmland Mut. Ins. Co. v. AGCO Corp.*, 531 F. Supp. 2d 1301, 1304-05 (D. Kan. 2008).

performed his analysis in reverse—because there was a fire, he assumes plaintiff was insufficiently warned about the dangers of placing combustibles close to halogen lights. The issue in this case is whether defendants adequately warned plaintiff of the risks associated with the halogen lights, not the adequacy of the actual warning provided by the manufacturer. Accordingly, Schlatman's opinion with regard to warnings is neither reliable nor helpful to the jury.

###    C.    James Martin

Defendants also seek to exclude at trial the expert opinion testimony of James Martin, an electrical engineer designated by plaintiff as an expert witness. Martin's expert opinions may be summarized as follows.

Martin first relied on his inspection of the on-site fire scene, which he toured with Schlatman. Martin examined the remains of three under cabinet mounted light fixtures recovered from the residence, which exhibited "extreme thermal damage." He also noted three similar light fixtures on the opposite side of the cabinet from the laundry appliances, which experienced only "slight discoloration. The mounting board containing these fixtures was removed from the underside of the wall cabinets and examined. Martin noted that these three fixtures were each mounted within a circular opening cut through the fiberboard and their supplying circuit conductors are routed along the top of the fiberboard under an applied layer of tape. He also noted two stick-on labels with printed graphics located on the topside of the fixtures that read "Caution: Risk of Fire." Martin then toured the basement, where he identified the source for the circuits supplying the lighting systems. The circuit fuse for under cabinet laundry lights was blown.

Martin also examined an exemplar light fixture that was a replicate of those installed in plaintiff's residence. The fixture, which was manufactured by Haefele America Company, came with instructions and printed stickers reading "Caution: Risk of Fire." Martin also noticed graphics imprinted on the front edge of the fixture's reflector that included a symbol indicating clearance from the fixture to combustibles of 5.9 inches. Martin reviewed the instruction sheet presented mounting requirements and a diagram for installation, and noted several statements of "special interest":

> B. When mounted in an enclosure, the recessed hole must pass completely through the mounting surface to allow ventilation. The maximum thickness of the mounting surface is 1" (25 mm).

> C. This fixture is suitable for use in alcove or under cabinet mounting application where there is at least one open side. This fixture shall additionally be spaced minimum 6" (15 cm) from any side surfaces and 12" (30.5 cm) from any surfaces below the fixture.

Martin concluded that, considering the installation methods used at plaintiff's residence, the light fixtures were not installed in conformance with the requirements stated in paragraph "B," because the mounting board was attached to the underside of the wall cabinets instead of through a recessed hold passing through the mounting surface. In addition, although the light fixtures were mounted approximately 18" (46 cm) above the countertop, which provided the 12" clearance below the fixture as required by paragraph "C," Martin concluded that the remaining usable vertical clearance of only 6" is not appropriate for a kitchen countertop. Martin based this conclusion on "common knowledge" that many combustible items with heights more than 6" are often placed on kitchen countertops, including paper towels, cardboard cereal boxes, packaged

loaves of bread and sacks of groceries.  Martin opines "[i]t is clear the lighting system designer did not consider the real world utilization of the kitchen countertops when the halogen light fixtures were specified."

Martin noted that while touring the site, a Haefele representative present at the site examination made a comment indicating the Haefele transformers provide only an 11.5 volt output, which Martin interpreted as being critical of the 12 volt rated transformers used on the lighting system and an attempt to suggest the fire would not have occurred if an 11.5 volt rated transformer had been used.  For this reason, Martin conducted an examination of the power supply system installed at plaintiff's residence.  Although his results are inconclusive, Martin noted that when the voltage to the lamp is varied, when the lamps are operated at more than rated voltage, the amount of light and heat produced increases.  Martin also opines that he was reasonably certain Haefele was aware of the restrictions placed on the operating voltages and temperatures for halogen lamps when it required their 11.5 volt rated transformer to be used with their halogen light fixtures.

In consideration of these observations and findings, Martin concluded that the fire was

> the direct result of the misapplication of the low voltage halogen light fixtures.  The concentrated thermal energy provided by the 20 watt halogen lamps was sufficient to initiate combustion of the bed linens temporarily placed on the countertop below the light fixtures.  These particular light fixtures, when installed under the wall cabinets above the countertop surface with only some 18" of clearance below them, did not provide for the reasonable, usual and customary safe use of the countertop space below.  To suggest otherwise exceeds the limits of common sense.

Defendants argue that Martin is not qualified to testify and that his testimony is not sufficiently

reliable under the standards set forth in *Daubert* and *Kumho Tire*.

### *Qualifications*

Defendants do not challenge Martin's educational background or competence to express opinions generally on matters of electrical engineering. The Court notes that Martin possesses a Bachelor of Science degree in electrical engineering and has an extensive track record in working, teaching and consulting in the field. Martin's professional experience includes the design of electrical and lighting systems in new and existing structures. He has completed more than 975 forensic engineering assignments and has received college-level instruction on the subject of fire science.

Defendants object to Martin's qualifications to testify to the proper design of laundry room and kitchen lighting systems, the proper application of lights in laundry rooms and kitchens or warnings provided to homeowners. Although Martin has no professional experience as a kitchen designer or cabinet maker or assembler, the Court agrees with plaintiff that his area of expertise would include the design of electrical and lighting systems in new and existing structures. Martin has designed electrical systems, including lighting systems, in residential homes. He has specified lighting systems that include halogen lamps and has worked with electrical contractors on many occasions. He has served as an electrical consultant for a company that manufactures cabinets. He has on numerous occasions worked with kitchen designers in helping design residential electric systems, including illumination systems. He has specified light fixtures for under-cabinet lighting many times. Martin has read peer-review articles on the use of halogen lights and has lectured on the use of halogen lights. Because Martin is experienced in the electrical aspects of defendants' work and his knowledge of lighting

fixtures and electrical lighting systems as it relates to the issues in this case, he is qualified to offer opinions concerning the hazardous nature of the light fixture at issue, by virtue of his education and experience in the field of electrical engineering. Martin is also qualified to testify concerning the anticipated use of the countertop space under the halogen lights. Although he is not a "human factors" expert, his evaluation of the design project and safety of the light fixture would necessarily take into consideration the reasonably anticipated use of the fixture and surrounding space. Finally, although it does not appear that Martin intends to provide testimony on the issue of warnings, the Court agrees with defendants that he is not a warnings expert.

### *Reliability*

Defendants argue that Martin's opinions regarding the design and misapplication of the halogen lights are not sufficiently reliable under the standards set forth in *Daubert* and *Kumho Tire*. As with Schlatman, defendants argue that Martin's testimony 1) is not based on sufficient facts or data, 2) is not the product of reliable principles and methodology, and 3) does not apply reliable principles and methods to the facts of the case.

With respect to the first point, defendants point to Martin's deposition testimony, which they characterize as an admission that there are no facts or data supporting his opinion. In that testimony, Martin admits that his opinion is based on his common sense because homeowners will need more than six inches of safe, usable space in a laundry room setting such as plaintiff's. Defendants complain that Martin assumes combustibles can be no closer than twelve inches from a halogen light bulb without lighting, and then uses this assumption as a basis for his opinion that under-cabinet halogen lights should not be used because homeowners will stack laundry closer than twelve inches to the under-cabinet lighting, without any supporting facts or data.

Defendants also criticize Martin's opinion with regard to whether there was adequate ventilation in the space above the top of the halogen puck light because of the way the light was mounted. Martin admits the alleged improper mounting did not cause or contribute to the fire and that in order to know whether the alleged insufficient ventilation caused the halogen light to be higher, he would have to know the distance between the combustibles and the light, which he does not know. With respect to the second point, defendants argue that Martin's reports and deposition testimony are devoid of any information regarding the application of any particular principles or methodology in reaching his conclusions, and are thus the product of assumptions supported by other assumptions. Similarly, with respect to the third point, defendants argue that Martin conducted no research whatsoever in formulating his opinion that utilization of halogen lights in plaintiff's laundry room was unsafe and the lights were improperly installed.

As with Schlatman, the Court does not view any of defendants' articulated deficiencies in testing and methodology sufficient to render Martin's opinion inadmissible with respect to the design and placement of the light fixture as hazardous. In this case, Martin's opinions are based on his education, training and experience. During his years of work as an electrical engineer, Martin has become familiar with the properties of halogen lights, as well as the risks associated with their use. Martin also relies on his professional experience in designing electrical and lighting systems for residential kitchens. The Court has reviewed Martin's affidavit, report and deposition, in which he explained the specific facts supporting his conclusion that the light fixture created an unreasonable fire hazard. In addition to inspecting the fire scene, Martin stated that he relied on his knowledge of the characteristics of halogen lights, including the high operating temperatures of the specific light used in plaintiff's kitchen and laundry room. Martin

further relied on the information he learned from reviewing the manufacturer's specifications, including the recommended safe clearance zone. As Martin explained in his report and deposition, the light fixture was positioned in such a way that normal use would include the placement of combustible items within that safe clearance zone, making it hazardous. In this case, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundations.[51] Because his "method" does not involve application of any controversial scientific process or theory, the *Daubert* factors are of less utility.[52] Martin's method is sufficiently reliable for purposes of Rule 702, and the Court denies defendants' motion with respect to this testimony.

## V. Discussion

### A. Negligent Design

Defendants claim plaintiff's negligence claims do not survive summary judgment because she is unable to establish the standard of care applicable to Kleweno, Cherie Brown and David Brown. Defendants argue that plaintiff does not have the required expert opinion establishing the standard of care for kitchen and laundry room designers and contractors or whether defendants deviated from said standards. Plaintiff counters that her negligent design claim is not a professional negligence claim, but rather, an "ordinary" negligence claim and thus expert testimony is not required. Alternatively, plaintiff argues that if expert testimony is required, James Martin is qualified to establish the standard of care for defendants.

---

[51] *Kumho Tire*, 526 U.S. at 150 (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)).

[52] *Farmland Mut. Ins. Co. v. AGCO Corp.*, 531 F. Supp. 2d 1301, 1304-05 (D. Kan. 2008)

The Pretrial Order sets forth the elements of plaintiff's claims for negligent design

against defendants Kleweno and Cherie Brown as follows:

> 1. Defendants owed Plaintiff a duty of care to use that degree of care and skill which would be used by **a reasonable competent kitchen and laundry room designer** providing similar services and acting in similar circumstances in the layout, design, drawing, specification, planning, installation, assembly and inspection of materials and services related to the custom kitchen remodel at Plaintiff's home.
>
> 2. Defendants breached this duty
>
> 3. As a result of Defendants' negligence, Plaintiff suffered damage to her real and personal property.[53]

Similarly, the negligent design claim against David Brown alleges:

> 1. Defendant owed Plaintiff a duty of care to use that degree of care and skill which would be used by a **reasonable competent contractor** providing similar services and acting in similar circumstances in the design, installation, assembly, specification, mounting and inspection of labor, materials and construction services related to the custom kitchen remodel at Plaintiff's home.[54]

Plaintiff argues that his negligence claims against defendants involve a "general"

negligence standard rather than one that applies to professionals.  The Court disagrees.  As

defendants point out, the language that plaintiff submitted as the essential element of her claims

for negligent design incorporates the language used for a breach of a professional's duty of care

---

[53](Doc. 158 at 16-17) (emphasis added).

[54]*Id*. at 18.

and comes directly from the Kansas Pattern Instruction for professional negligence, which states:

> In performing professional services, *(a) (an)* _____ has
> a duty to use that degree of care and skill which would be used by
> a reasonably competent _____ providing similar
> services *(in the same community or similar communities)* and
> acting in similar circumstances.[55]

By contrast, the general negligence standard is lack of ordinary or reasonable care, and is the failure of a person to do something that an ordinary person would do or not do.[56] Plaintiff clearly alleges defendants were negligent in that they failed to use the degree of care and skill used by a reasonable competent kitchen and laundry room designer and contractor. Clearly, plaintiff does not allege lack of ordinary care, but care involving the professional standards applicable to a kitchen designer or a contractor. Plaintiff's argument that kitchen remodeling is not a "profession" is disingenuous and contrary to the clear terms of the Pretrial Order, which are controlling.[57]

This conclusion leads to the next query: whether plaintiff must produce expert testimony to establish the standard of care necessary to establish a breach of such a duty? "Expert testimony is often required to establish the standard of care in cases involving professional actions and whether the professional deviated from the standard of care."[58] "'The primary

---

[55]PIK Civil 4th 123.70.

[56]PIK Civil 4th 103.01; *Hickert v. Wright*, 319 P.2d 152 (1957) (negligence is the want of ordinary care and may consist of acts of omission as well as acts of commission).

[57]Under Rule 16(e) of the Federal Rules of Civil Procedure, a pretrial order "may be modified 'only to prevent manifest injustice.'"

[58]*Bi-State Dev. Co. v. Shafer, Kline & Warren, Inc.*, 990 P.2d 159, 162 (Kan. Ct. App. 1999) (citations omitted).

purpose of expert testimony is to establish the community standards for the benefit of the trier of fact when the facts are somewhat alien in terminology and the technological complexities would preclude an ordinary trier of fact from rendering an intelligent judgment.'"[59] "The common knowledge exception applies where a layperson's common knowledge is sufficient to recognize a deviation from the accepted standard of care."

Plaintiff argues that the standard of care is defined by law, in that there is implied in every contract for work or services a duty to perform it "skillfully, carefully diligently, and in a workmanlike manner." That standard, however, relates to a claim for implied warranty of workmanlike performance.[60] As explained above, plaintiff chose to bring her claim against defendants for professional negligence, not breach of an implied warranty of workmanlike performance, and the duty to perform services in a workmanlike manner has no application to that claim.[61]

Next, plaintiff argues that due to the nature of the misconduct alleged, the jury is capable of deciding if defendants have breached their respective duties of care. Specifically, plaintiff contends that Cherie Brown was negligent in specifying the halogen light fixture in a residential application for which it was not safe and that David Brown was negligent in installing the light fixture because he knew or should have known that the use of the light

---

[59]*In re Estate of Maxedon*, 946 P.2d 104, 111 (Kan. Ct. App. 1997) (quoting *Juhnke v. Evangelical Lutheran Good Samaritan Soc'y*, 634 P.2d 1132, 1137 (Kan. 1981)).

[60]*See Zenda Grain & Supply Co. v. Farmland Indus., Inc.*, 894 P.2d 881, 890-91 (Kan. Ct. App. 1995).

[61]*Id.* (quoting *Tamarac Dev. Co. v. Delamater, Freund & Assocs.*, 675 P.2d 361, 365 (Kan. 1984)) (holding a party injured by work performed by an architect may chose his remedy from express contract, implied warranty or negligence).

fixture in the location specified by Cherie Brown created an unreasonable risk of fire, but did not warn plaintiff. Plaintiff contends that due to the "self-evident" nature of the misconduct alleged, the jury will not need an expert to help them decide if defendants breached their respective duties of care. The Court disagrees.

"Whether expert testimony is necessary to prove negligence is dependent on whether, under the facts of a particular case, the trier of fact would be able to understand, absent expert testimony, the nature of the standard of care required of defendant and the alleged deviation from that standard."[62] "Expert testimony is often required to establish the standard of care in cases involving professional actions and whether the professional deviated from the standard of care."[63]

"'The primary purpose of expert testimony is to establish the community standards for the benefit of the trier of fact when the facts are somewhat alien in terminology and the technological complexities would preclude an ordinary trier of fact from rendering an intelligent judgment.'"[64] "The common knowledge exception applies where a layperson's common knowledge is sufficient to recognize a deviation from the accepted standard of care."[65] Examples of application of the common knowledge exception include extreme cases involving a nursing home's duty to protect other patients from a known violent patient with a history of injuring his

---

[62]*Gaumer v. Rossville Truck & Tractor Co.*, 202 P.3d 81, 84 (Kan. Ct. App. 2009) (citing *Juhnke,* 634 P.3d at 1136).

[63]*Bi-State Dev. Co. v. Shafer, Kline & Warren, Inc.*, 990 P.2d 159, 162 (Kan. Ct. App. 1999).

[64]*In re Estate of Maxedon*, 946 P.2d 104, 111 (Kan. Ct. App. 1997), *rev. denied* 263 Kan. 886 (quoting *Juhnke*, 634 P.2d at 1136).

[65]*Midwest Iron & Metal, Inc. v. Zenor Elec. Co.*, 19 P.3d 181, 183 (Kan. Ct. App. 2000).

co-patients,[66] and a physician's duty where a sponge or instrument was left inside a patient during surgery.[67]

The Court holds that the common knowledge exception is not applicable to the facts here. Despite the ordinary experience of jurors with kitchens and home construction projects, the facts in this case involve the standard of care for a professional kitchen designer and a professional contractor. Here, the standard of care of a kitchen designer in selecting light fixtures for a kitchen and a contractor who installs those fixtures is outside the ordinary experience and common knowledge of the jury and beyond the capability of a lay person to decide. Instead, to establish the standard of care for a kitchen designer and a contractor, plaintiff must present testimony of someone who is competent to testify as to whether the defendants' respective actions conformed to the standard of care for their respective professions. Thus, the issue becomes whether James Martin is competent to testify as to the standard of care for Cherie and David Brown. The Court discusses each defendant in turn.

### Cherie Brown

Plaintiff states that she intends to demonstrate that Cherie Brown was negligent in specifying the subject light fixture in a residential application for which it was not safe.[68] Plaintiff argues that Martin is qualified, by virtue of his professional experience, to inform the jury of the standard of care applicable to Cherie Brown in designing the illumination system for the kitchen and laundry room project, as well as the specific ways in which Brown deviated from

---

[66]*Juhnke*, 634 P.2d at 1136.

[67]*Webb v. Lungstrum*, 575 P.2d 22, 26 (Kan. 1978).

[68](Doc. 178 at 44.)

that standard. Plaintiff argues that while Martin is not a professional "kitchen designer," his professional experience in the design of lighting systems for residential applications qualifies him to testify as to the duty of care owed by Brown.

As plaintiff sets out in the Pretrial Order, in performing professional services, a kitchen designer has a duty to use that degree of care and skill that would be used by a reasonably competent kitchen designer providing similar services.[69] In this case, although Cherie Brown is a professional kitchen designer, she does not have a degree in design, nor does she hold any professional licenses. Ordinarily, the standard of care in a trade or profession is determined by testimony of witnesses in the same trade or profession. The critical factor in determining the competency of an expert is whether that witness has expert knowledge that can assist the trier of fact in resolving the issues before it.[70] Courts have considered expert testimony from an individual in a trade different than that at issue when the testimony was within the scope of the witnesses' expertise.[71]

The negligent kitchen and laundry room design claim against Cherie Brown concerns the determination of the type and placement of lights used as part of the overall kitchen and laundry room design. By contrast, defendants argue, Martin's training and expertise is "electrical/illumination system design," which concerns the determination of how to power said lights. Thus, defendants argue, Martin is not qualified to testify as to Cherie Brown's duty in

---

[69](Doc. 158 at 17).

[70]*Security Nat'l Bank v. City of Olathe*, 589 P.2d 589, 592 (Kan. 1979).

[71]*See id.* (permitting civil engineer to testify to the standard of care of land-use planner); *Prichard Bros. v. Grady, Co.*, 436 N.W.2d 460, 465-66 (Minn. Ct. App. 1989) (permitting witnesses that are not licensed architects to testify as to the quality or sufficiency of an architect's design, where the testimony was within the scope of the witness' expertise); *Wessel v. Erickson Landscaping Co.*, 711 P.2d 250 (Utah 1985) (permitting structural engineer to testify to the standard of care of landscape architect designing a retaining wall).

providing services to plaintiff or the standard of care of kitchen and laundry room designers. While the Court agrees that Martin cannot testify as to what the standard is for a kitchen designer in general, the Court will allow Martin to express an opinion based on his experience and training as to specifying lighting systems for residential kitchens, specifically systems for under-cabinet applications. Martin has worked as a consultant in designing electrical lighting systems, including specifying fixtures that utilize halogen lamps for under-cabinet lighting. He has worked with kitchen designers, including projects where his job was to help design the electrical system, including the illumination system. Because there is no evidence that Cherie Brown used an electrical engineer to review the design or otherwise perform the functions that Martin has performed when he has been involved in kitchen projects, she essentially performed this function herself when planning the design and placement of the light fixtures. The matters relating to Cherie Brown's alleged negligence with respect to choosing and placing the halogen light fixture for the laundry room and determining whether the fixtures would be safe given their intended use is within the scope of Martin's expertise. Ultimately, the weight of the evidence will be for the jury to decide.

### David Brown

Plaintiff states that she intends to demonstrate that David Brown either knew or should have known that the use of the light fixture in the location specified created an unreasonable risk of fire, and that he thus breached a duty of care owned to plaintiff by installing the light in the hazardous location without providing adequate warning to plaintiff.[72] Plaintiff argues that Martin is qualified, by virtue of his professional experience, to inform the jury of the standard of

---

[72](Doc. 178 at 45.)

care applicable to David Brown in performing the electrical installation services for the kitchen and laundry room project, as well as the specific ways in which Brown deviated from that standard. Plaintiff argues that while Martin is not a professional contractor, his professional experience in the design and installation of lighting systems for residential applications qualifies him to testify as to the duty of care owed by Brown. Defendants do not specifically address Martin's testimony with respect to David Brown.[73]

As plaintiff sets out in the Pretrial Order, in performing professional services, a contractor has a duty to use that degree of care and skill that would be used by a reasonably competent contractor providing similar services.[74] However, plaintiff does not claim, nor does Martin opine, that David Brown's installation of the light was negligent or not as specified or the cause of the fire. Instead, plaintiff claims that Brown knew or should have known that the light fixture chosen by Cherie Brown and furnished by Kleweno was hazardous when installed as specified and breached his duty of care by failing to warn plaintiff of this hazard.[75] Because plaintiff does not have expert testimony to establish the standard of care necessary to establish a breach of such a duty, she is entitled to summary judgment on her negligence claim against David Brown. In so ruling, the Court notes that the negligence claim against David Brown appears to be an alternative way to couch the negligent failure to warn claim. As discussed further below, since David Brown was not the seller of the light fixture, but the installer, this

---

[73](Doc. 186 at 80.)

[74](Doc. 158 at 17).

[75]As the Court previously noted at Section IV.C, *supra*, although it does not appear that Martin intends to provide testimony on the issue of warnings, he is not a warnings expert.

claim is dismissed.[76]

## B.    Negligent Failure to Warn

In Kansas, a failure to warn claim, whether couched in negligence or strict liability, employs the same measure of reasonableness under the circumstances.[77]  K.S.A. 60-3305 limits a manufacturer or seller's duty to warn.  There is no duty to warn if (1) the warnings would relate "to precautionary conduct that a reasonable user or consumer would take for protection," (2) the situation is one where a reasonable user or consumer would have taken the precaution, and (3) the warnings would relate to open and obvious hazards that a reasonable user or consumer would appreciate.[78]  In other words, "Kansas law does not impose a duty to warn of dangers actually known to the product user, or of obvious common dangers or generally known risks connected with the use of the product."[79]  "'If a danger is obvious, then its obviousness constitutes a warning, and the product seller's failure to provide a separate warning should not constitute a defect.'"[80]

Defendants Kleweno, Cherie Brown and David Brown argue that they are entitled to summary judgment on this claim because (1) plaintiff was warned, (2) defendants had no duty to warn plaintiff as a matter of law, (3) David Brown was not a seller or manufacturer and had no

---

[76]*See infra* Section V.B.

[77]*Miller v. Lee Apparel Co.*, 881 P.2d 576, 587 (Kan. Ct. App. 1994) (quoting *Richter v. Limax Int'l, Inc.*, 822 F. Supp. 1519, 1521 (D. Kan. 1993), *rev'd on other grounds*, 45 F.3d 1464 (10th Cir. 1995)); *see also Duffee v. Murray Ohio Mfg. Co.*, 879 F. Supp. 1078, 1081 (D. Kan. 1995), *aff'd*, 91 F.3d 1410 (10th Cir. 1996).

[78]*Patton v. Hutchinson Wil-Rich Mfg. Co.*, 861 P.2d 1299, 1312 (Kan. 1993).

[79]*Duffee*, 879 F. Supp. 1078, 1082 (D. Kan. 1995) (citations omitted).

[80]*Miller*, 881 P.2d at 588 (quoting William Westerbeke, *Some Observations on the Kansas Product Liability Act (Part 2)*, 54 J. Kan. Bar Assoc. 39, 44 (1985)).

duty to warn plaintiff as a matter of law, (4) the required expert testimony does not exist to support these claims, and (5) a warning to plaintiff would not have prevented the injury. Defendant Means also moves for summary judgment, arguing that as a mere "assembler" of the halogen light fixtures, he had no duty to warn plaintiff as a matter of law.

The Court agrees with defendants David Brown and Means that as the contractor and assemblers, they had no duty to warn plaintiff. Neither Brown nor Means was the manufacturer or seller of the lights. Plaintiff does not cite, nor did the Court's research reveal, any case law extending this duty beyond the manufacturer or seller of a product. Plaintiff's cases cited in support of her argument discuss liability for injury to a third party for work negligently performed by a contractor after the work was completed and accepted by the party to whom the performance was owed; neither involved a claim of failure to warn.[81] By contrast, plaintiff seeks to impose a duty upon these defendants for failing to warn plaintiff about potential hazards and keeping combustible materials a safe distance from the light. Because Kansas does not impose such a duty to warn against a non-selling installer, defendants David Brown and Means' motions for summary judgment are granted on this claim.

Thus, the Court devotes the remainder of its discussion to the negligent warning claim against Kleweno and Cherie Brown, who contracted to sell the light fixtures as part of the kitchen and laundry project. In support of her failure to warn claim, plaintiff argues that defendants have not shown that they communicated any warning to plaintiff, much less one that is adequate to defeat defendants' motion as a matter of law. In this case, David Brown testified

---

[81]*See Kristek v. Catron*, 644 P.2d 480, 496-97 (Kan. Ct. App. 1982) (action for negligence by subsequent home buyer against builder for damages caused by a leaky roof); *Talley v. Skelly Oil Co.*, 433 P.2d 425, 433 (Kan. 1967) (holding that injured third party may sue for negligence of a contractor, rejecting the need for privity with the owner).

that he, or someone working with him, left a large stack of product literature in a drawer in plaintiff's kitchen and that the stack included at least one of "the instruction sheets that came with the lights." The written materials contained "Mounting Instructions" for the light fixtures that contained language regarding the risk of fire and the need to maintain a minimum distance of 12" between the light and any surface. David Brown also testified that he did not attach the cautionary warning sticker to the surface of the puck lights. Plaintiff testified that she did not know if the product literature left by David Brown included information specific to the halogen puck lights. Kansas law requires a seller to convey adequate warnings that it has received from a manufacturer.[82] The jury could reasonably conclude that leaving a stack of materials including a warning, without making plaintiff aware of the light fixture's inherent danger, was an inadequate method by which to warn plaintiff. Moreover, the written instructions were not for how to use the light fixture, but how to mount it. Thus, there remains a material question of fact whether defendants adequately warned plaintiff about the risks associated with the halogen light fixture after it was installed.

Defendants also argue that plaintiff cannot prove causation because she has not shown that the fire would not have occurred had a warning been provided by defendants, and that there is no evidence had an additional warning been provided, plaintiff and her sister's actions would have been the same. Under Kansas law, a manufacturer or seller's failure to provide an adequate warning creates a rebuttable presumption of causation.[83] Because plaintiff has testified that she was not fully aware of the risks associated with the light fixture, this issue remains one for the

---

[82]*Mason v. Texaco*, 741 F. Supp. 1472, 1489 (D. Kan. 1990).

[83]*Burton v. R.J. Reynolds Tobacco Co.*, 208 F. Supp. 2d 1187, 1193 (D. Kan. 2002) (citing *Richter v. Limax Int'l, Inc.*, 45 F.3d 1464, 1471-72 (10th Cir. 1995)).

jury.

Defendants next argue that they did not have a duty to warn plaintiff because she already knew of the potential dangers from halogen lights. Plaintiff testified that before the fire, she knew halogen lights got hot and could pose a fire hazard if combustible materials were left in close proximity of the lights, conceding that it was "common knowledge" that if you put something too close to a light, it would cause a fire. The Court agrees with plaintiff that this testimony does not prove that she knew of the specific hazard in question caused by the placement of the halogen lights. At best, it would allow a jury to find that plaintiff had a general knowledge of the dangers of halogen lights, not the specific hazard involved in this case, that is, the danger associated with the light fixture as it was placed and utilized in her kitchen/laundry room. Likewise, plaintiff's answers to such general questions about halogen lights do not reflect an understanding of the extent of the limitations on use of the countertops when the lights were activated. Whether defendants are entitled to this exception from the duty to warn is also a question for the jury.

Finally, defendants argue that there is no expert testimony supporting plaintiff's negligent failure to warn claim. Although Kansas courts have held that testimony of experts in failure to warn claims, when offered, "should be considered," such expert evidence is not required.[84] This is not a case involving so-called "human factors" or feasibility or effectiveness of the language of the warning provided. Rather, the issue boils down to whether plaintiff received the warning and if so, was it is adequate to apprise her of the dangers of the halogen lights as used in her kitchen/laundry room, and alternatively, whether a warning was required at all. In this context,

---

[84]*Burton*, 208 F. Supp. 2d at 1197.

44

adequacy of warnings is not too complex for a lay juror to decide.

### C.    Breach of Implied Warranty of Fitness for a Particular Purpose

### 1.    Statute of Limitations

Count III asserts claims against defendants Kleweno, Cherie Brown and David Brown for breach of implied warranty for fitness for a particular purpose.  Defendants contend that plaintiff's implied warranty claim is time-barred because plaintiff's breach of implied warranty theory sounds in contract and therefore, the three-year statute of limitations period for implied contracts not in writing found at K.S.A. 60-512 applies.  Plaintiff counters that although her implied warranty of fitness for a particular purpose claim arises under the Uniform Commercial Code ("U.C.C.") and its four-year statute of limitations,[85] her action is actually one sounding in tort, and thus the two-year statute of limitations found at K.S.A. 60-513 applies.  Plaintiff's claim is untimely if either of the contract statutes of limitation apply; it is timely if the two-year statute of limitations for tort claims applies, as that statute includes the "substantial damage" accrual rule, and damage attributable to defendants' negligence did not occur until the date of the fire.[86]

"[D]etermining the proper statute of limitations for plaintiff['s] breach of warranty claims turns on whether [plaintiff has] alleged physical damage to property from a dangerous product or simple economic loss from a defective one."[87]  In other words, "[i]f simple economic loss is alleged, the contract statute of limitations governs.  However, 'where death, personal injury or

---

[85]K.S.A. 84-2-725.

[86]K.S.A. 60-513(b) ("the cause of action in this action [section] shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, . . .").

[87]*Lim Enter. v. Sears, Roebuck & Co.*, 912 F. Supp. 478, 479 (D. Kan. 1996) (quoting *Winchester v. Lester's of Minn., Inc.*, 983 F.3d 992, 995 (10th Cir. 1993)) (applying Kansas law).

property damage is alleged the applicable statute of limitations in Kansas would be the two-year tort statute of limitations at K.S.A. 6–513. . . .'"[88]

"Under Kansas law, a tort action cannot be sustained if the plaintiff has suffered only economic loss from a defective product."[89]  Case law in both the Kansas courts and Tenth Circuit precedent provide guidance in making this distinction.  In *Elite Professionals, Inc. v. Carrier Corp.*,[90] the Kansas Court of Appeals defined economic loss as including "loss of use of the defective product, cost of replacing the product, loss of profits to plaintiff's business, or damage to plaintiff's business reputation from use of the product. . . ."[91]  The Tenth Circuit, interpreting Kansas law, has held that "an action for damages from a product's qualitative defects alone without proof of the product's dangerousness cannot sound in tort."[92]

Applying these considerations, the Tenth Circuit in *Winchester v. Lester's of Minnesota, Inc.*[93] held that "economic losses occasioned by a qualitative defect 'that precludes the product from being fit for its intended use or functioning as expected for the purpose it was designed,' are not recoverable in tort.[94]  In that case, which interpreted Kansas law, breach of warranty claims asserted by buyers of a hog house against the manufacturer seeking to recover for loss of hogs and failure of hogs to gain weight due to an improper ventilation system, as well as

---

[88]*Cowan by Cowan v. Lederle Lab., a Div. of Am. Cyanamid Co.*, 604 F. Supp. 438, 441 (D. Kan. 1985) (quoting *Grey v. Bradford-White Corp.*, 581 F. Supp. 725, 728 (D. Kan. 1984)).

[89]*Id.*  (citing *Winchester*, 983 F.2d at 999).

[90]827 P.2d 1195, 1202 (1992).

[91]*Id.* (citing *Fordyce Concrete, Inc. v. Mack Trucks, Inc.*, 535 F. Supp. 118, 123 (D. Kan. 1982)).

[92]*Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1581 (10th Cir. 1984).

[93]983 F.2d at 983.

[94]*Id.* at 996 (quoting *Daitom*, 741 F.2d at 1581).

recovery for veterinarian bills and loss of profits, sounded in contract rather than tort and were thus governed by the four-year statute of limitations under the U.C.C.[95]  Similarly, in *Lim Enterprises v. Sears, Roebuck & Co.*,[96] a restaurant owner that sought damages for its economic loss due to disruption of its business following a fire allegedly caused by a washer-dryer unit that plaintiff purchased from defendant, sought economic damages under the U.C.C., rather than under tort.[97]  The court determined that, where the facts alleged would support a claim under either tort or contract, plaintiff is entitled to pursue the theory of its choice; because the plaintiff alleged damages in the amount of its economic loss rather than the amount of property damages it sustained, its claim was timely under the four-year statute of limitations.[98]

In this case, by contrast, plaintiff seeks to recover damages for physical damage to her entire home and the personal property contained therein.[99]  Plaintiff alleges her damages were caused by the hazardous location of the halogen light fixture in her kitchen and laundry area, not that the halogen light fixture was defective.  Plaintiff's damages alleged are clearly "tort-like."  Accordingly, K.S.A. 60-513(a)(4) contains the proper statute of limitations.  Substantial damage occurred on the date of the fire, November 11, 2006.  Plaintiff filed this lawsuit on July 3, 2008, within the applicable limitations period.

## 2.    Expert Testimony

---

[95]*Id.*

[96]912 F. Supp. 478 (D. Kan. 1996).

[97]*Id.* at 479.

[98]*Id.*

[99](Pretrial Order, Doc. 158 at 27.)

Defendants argue in the alternative that plaintiff cannot prove her breach of implied warranty claims due to lack of expert testimony in support, because a jury is not qualified to judge the quality of defendants' work without expert guidance. In an implied warranty claim, however, the issue is not quality of the work, but whether the seller has reason to know any particular purpose for which the product is required, and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods.[100] In light of the Court's ruling denying this aspect of the motion to limit Martin's testimony, summary judgment is not appropriate on this basis and defendants' motion is denied. The testimony of Martin will assist the jury in determining whether the cabinet lights under the countertop in the kitchen/laundry were unfit for their particular purpose if they were rendered dangerous by reasonably anticipated uses, such as stacking or folding laundry.[101]

### D.    Breach of Express Warranty

Count III also alleges a breach of express warranty claim against defendants Kleweno, Cherie Brown and David Brown, alleging that defendants expressly warranted that the custom kitchen and laundry room was functional and safe for its ordinary and intended use and purpose. Plaintiff does not specify whether this express warranty was written or oral. Defendants argue that plaintiff's claim is time-barred. Plaintiff does not respond to this issue.

The Court agrees with defendants that any breach of an express warranty would have

---

[100]K.S.A. 84-2-315.

[101]The Court notes that the implied warranty of fitness for a particular purpose claim is asserted against Kleweno, Cherie Brown and David Brown. Like the negligent failure to warn claim, it appears this claim is also limited to sellers. *See* K.S.A. 84-2-314. David Brown does not raise this issue on summary judgment, however, and the Court does not address it at this time.

occurred no later than the end of the construction project, or October 22, 2002.[102]  Plaintiff filed

her Complaint on July 3, 2008.  Pursuant to K.S.A. 60-511(1), the statute of limitations for

breach of an express written warranty is five years.  Pursuant to K.S.A. 60-512, the statute of

limitations for a breach of express warranty based on an oral contract is three years.  And, under

the U.C.C., the statute of limitations is four years.[103]  Regardless of the type of contract on which

the alleged express warranty is based, "the action for breach of contract accrues when a contract

is breached by the failure to do the thing agreed to, irrespective of any knowledge on the part of

the plaintiff or of any actual injury it causes."[104]

Even assuming plaintiff's claim was timely, however, there is no evidence in the record

that defendants ever made any explicit statements to her that the kitchen and laundry room was

functional and safe for its intended use and purpose.  "It is clear that for there to be an express

warranty, there must be an explicit statement, written or oral, by the party to be bound prior to or

contemporaneous with the execution of the contract."[105]  The contract executed by Kleweno and

plaintiff on October 17, 2001, states:

---

[102]*See Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1247 (10th Cir. 1993) (stating in Kansas, a cause of action for breach of contract accrues at the time of the breach) (citing *Rupe v.Triton Oil & Gas* Corp., 806 F. Supp. 1495, 1498 (D. Kan. 1992)).

[103]K.S.A. 84-2-725.

[104]*Pizel v. Zuspann*, 795 P.2d 42, 54 (Kan. 1990) (citing *Price, Administrator v. Holmes*, 422 P.2d 976 (Kan. 1967)); *see Rupe*, 806 F. Supp. at 1498 (stating knowledge of a breach is irrelevant in Kansas in determining when a cause of action accrues); *Four Seasons Apartments, Ltd. v. Triple A Glass Servs., Inc.*, 152 P.3d 101, 105 (Kan. Ct. App. 2007) (stating K.S.A. 60-512 does not contain a discoverability provision); KS.A. 84-2-725(2) ("a cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await until the time of such performance the cause of action accrues when the breach is or should have been discovered.").  Plaintiff does not argue or assert that defendants explicitly warranted the custom kitchen and laundry extended to future performance.

[105]*Corral v. Rollins Protective Servs. Co.*, 732 P.2d 1260, 1266 (Kan. 1987).

> The standard form of warranty shall apply to the service and
> equipment furnished (except where other warranties of purchased
> products apply). The warranty shall become effective when signed
> by the Seller and delivered to the Purchaser. The warranty is for
> one-year materials and maintenance.[106]

There is nothing in the agreement itself which constitutes an express warranty as claimed by plaintiff. Nor does plaintiff point to any oral statements made by defendants regarding any express warranty. Defendants' motion for summary judgment is granted on this claim.

### E.      Breach of Contract

Count V alleges a breach of contract claim against defendants Kleweno, Cherie Brown and David Brown. As with plaintiff's express warranty claims, plaintiff has not challenged or responded to defendants' motion for summary judgment on these claims as time-barred. As discussed above, in Kansas, a cause of action for breach of contract accrues at the time of the breach, regardless of knowledge. Accordingly, defendants' motion for summary is granted on this claim.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' Joint Motion in Limine to Exclude the Testimony of James Martin (Doc. 151) is DENIED; and defendants' Joint Motion in Limine to Exclude the Testimony of Michael Schlatman (Doc. 153) is GRANTED in part;

**IT IS FURTHER ORDERED** that defendants' Motion to Strike (Doc. 187) is DENIED; defendants' Joint Motion for Summary Judgment (Doc. 149) is GRANTED with respect to the negligent design and failure to warn claims against David Brown, and the breach of express

---

[106](Doc. 178, Ex. 17.)

warranty claims and the breach of contract claims against Kleweno, Cherie Brown and David Brown; defendants' motion is DENIED with respect to the negligent design and failure to warn claims against Kleweno and Cherie Brown, and the breach of implied warranty claim against Kleweno, Cherie Brown and David Brown;

**IT IS FURTHER ORDERED** that defendant Means' Motion for Summary Judgment (Doc. 154) is GRANTED; Means' Motion to Exclude Plaintiff's Experts (Doc. 157) is DENIED as moot.

**IT IS SO ORDERED.**

Dated: March 23, 2010

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE